# In the United States Court of Federal Claims

No. 24-16

(Filed Under Seal: July 31, 2024)

Reissued: August 14, 2024[*]

```
* * * * * * * * * * * * * * * **  *
                                  *
THE TOLLIVER GROUP, INC.,         *
                                  *
              Plaintiff,          *
                                  *
       v.                         *
                                  *
THE UNITED STATES,                *
                                  *
              Defendant,          *
                                  *
and                               *
                                  *
DIGIFLIGHT, INC.,                 *
                                  *
              Defendant-Intervenor. *
                                  *
* * * * * * * * * * * * * * * **  *
```

 *W. Brad English*, Maynard Nexsen PC, with whom were *Jon D. Levin*, *Emily J. Chancey*, *Nicholas P. Greer*, and *Taylor R. Holt*, Maynard Nexsen PC, all of Huntsville, AL, for Plaintiff.

 *Mikki Cottet*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were *Deborah A. Bynum*, Assistant Director, *Patricia M. McCarthy*, Director, and *Brian M. Boynton*, Principal Deputy Assistant Attorney General, all of Washington, D.C., for Defendant, and *John C. Degnan*, Trial Attorney, Legal Service Agency, United States Army, of Fort Belvoir, VA, of counsel.

 *Roderic G. Steakley*, Dentons Sirote, PC, of Huntsville, AL, with whom were *Benjamin R. Little*, Dentons Sirote, PC, of Florence, AL, and *Jerome S. Gabig*, Gabig Law Firm, of Guntersville, AL, for Defendant-Intervenor.

---

[*] Pursuant to the protective order entered in this case, this opinion was initially filed under seal. The parties provided proposed redactions of confidential or proprietary information, which are redacted in this version of the opinion.

## OPINION AND ORDER

**SOMERS**, Judge.

While "tie goes to the runner" may be an improper recitation of the rules of baseball, tie goes to the government may best describe this bid protest.  *See e.g.,* Mark Dewdney, *"COME ON, BLUE: TIE GOES TO THE RUNNER!" No, It Does Not*, Bleacher Report (July 27, 2009).[1] For the reasons that follow, the Court determines that the protestor, The Tolliver Group, Inc., ("Tolliver") has not met its burden to show the agency acted in a manner that was arbitrary, capriciously, an abuse of discretion, or otherwise not in accordance with law.  Although Tolliver has demonstrated shortcomings with individual aspects of the price reasonableness analysis, it has not demonstrated that, as a whole, the price reasonableness analysis was irrational.  As such, the government is entitled to judgment on the administrative record.

## BACKGROUND

### A.      The Solicitation

On December 1, 2021, the U.S. Army issued a request for quotation seeking programmatic support services for U.S. Army Aviation and Missile Command ("AMCOM"), including: "resource management; cost estimating/analysis and budget preparation; program management, plans, and integration; schedule development and assessment; systems analysis; strategic planning; risk analysis; and risk mitigation to various offices and staffs within AMCOM."  AR 64.   The procurement was conducted as a total small business set-aside, only open to vendors that already had EXPRESS Blanket Purchase Agreements ("BPAs") with the General Services Administration.  AR 65.   The Army conducted the procurement under FAR Subpart 8.4; it was "**not** a FAR Part 15 negotiated competition."  AR 67 (emphasis in original).

The award, according to the RFQ, would be given to the offeror "whose quotation provide[d] the best value to the Government . . . ."  AR 75.  The RFQ laid out three evaluation criteria: Technical Expertise, Risk Mitigation and Management, and Price.  AR 75–79. Additionally, the RFQ described how the evaluation criteria would be weighed in relation to each other:

> The first two criteria, Technical Expertise, and Risk Mitigation and Management, are of equal importance, and each of them is of greater importance than Price.  Price is not expected to be the controlling criterion in the selection, but its importance will increase as the differences between the evaluation results for the other criteria decrease.

AR 75.

The RFQ additionally described how the Army would evaluate the individual criteria. Technical Expertise would be evaluated "based on how well the quotation demonstrate[d] a clear

---

[1] *Available at* https://bleacherreport.com/articles/225160-come-on-blue-tie-goes-to-the-runner-no-it-does-not.

understanding of the requirements and deliverables, and on the Offeror's expressed ability to perform." AR 76.  In addition, this evaluation would be "based on the degree to which [the quotation] thoroughly demonstrate[d] the Offeror underst[ood] the services to be delivered in order to meet the requirements of the PWS and the Offeror's ability to perform those services." *Id.*  The government highlighted specific PWS paragraphs that were "critical to evaluation of the Offeror's technical expertise."[2] *Id.*  The RFQ required offerors to have "specifically addressed [those paragraphs] in the quotation." *Id.* The following standards were the rating criteria for Technical Expertise:

| Technical Expertise Ratings | |
|---|---|
| **Rating** | **Description** |
| **Outstanding** | Quotation meets requirements and indicates an exceptional level of expertise and an understanding of the requirements.  Strengths far outweigh any weaknesses.  Risk of unsuccessful performance is very low. |
| **Good** | Quotation meets requirements and indicates a thorough level of expertise and an understanding of the requirements.  Strengths outweigh any weaknesses.  Risk of unsuccessful performance is low. |
| **Acceptable** | Quotation meets requirements and indicates an adequate level of expertise and an understanding of the requirements. Strengths and Weaknesses are offsetting or will have little or no impact on contract performance. Risk of unsuccessful performance is moderate. |
| **Unacceptable** | Quotation does not meet requirements and contains one or more deficiencies. If this criterion is rated as **Unacceptable**, additional factors will not be evaluated and the quotation is not eligible for award. |

AR 76–77.

For Risk Mitigation and Management, offerors needed to "identify a robust Risk Mitigation and Management approach to ensure successful performance of the PWS."  AR 77. Three specific risks were identified to be addressed: "1. The ability to obtain and retain qualified personnel.  2. The ability to bring together the right team to perform the PWS requirements. 3. The ability to effectively manage the project." *Id.*  Additionally, "[t]he quotation shall identify any possible adverse impacts to existing programs/projects and include an approach that ensures the successful performance of the PWS while avoiding or mitigating such impacts on other programs/projects." *Id.*  "The Government will evaluate the Risk Mitigation and Management approach to assess completeness, feasibility, and how well it addresses the details of the PWS." *Id.*  The following ratings were used to evaluate the Risk Mitigation and Management factor:

| Risk Mitigation and Management Ratings | |
|---|---|
| **Rating** | **Description** |
| **Outstanding** | Quotation meets requirements and indicates an exceptional level of expertise and an understanding of the requirements.  Strengths far outweigh any weaknesses.  Risk of unsuccessful performance is very low. |

---

[2] The paragraphs were 3.1.3, 3.1.10, 3.1.11, 3.1.14, 3.1.15, 3.1.16, 3.1.17, 3.2.2, and 3.2.3.  AR 76.

| Good | Quotation meets requirements and indicates a thorough level of expertise and an understanding of the requirements.  Strengths outweigh any weaknesses.  Risk of unsuccessful performance is low. |
|------|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| Acceptable | Quotation meets requirements and indicates an adequate level of expertise and an understanding of the requirements. Strengths and Weaknesses are offsetting or will have little or no impact on contract performance. Risk of unsuccessful performance is moderate. |
| Unacceptable | Quotation does not meet requirements and contains one or more deficiencies. If this criterion is rated as **Unacceptable**, additional factors will not be evaluated and the quotation is not eligible for award. |

AR 77–78.

The final factor was Price, and the RFQ provided that "[t]he Government will use price analysis to determine overall price reasonableness." AR 78.  "Reasonableness means a fair and reasonable price; i.e., a price that a prudent businessperson would pay for an item or service under competitive market conditions, given a reasonable knowledge of the marketplace."  AR 79.  Moreover,

> [t]he government will assess the price quotation to ensure the proposed pricing is realistic for the work to be performed, reflects a clear understanding of the requirements, and is consistent with the various elements of the other parts of the quotation.  Unrealistic pricing will not be adjusted by the Government in its evaluations, but it reserves the right to reject a quotation upon a determination that a price is unrealistically low.  All direct labor hours, skill mix, and labor categories in the Price Quotation must be consistent with the technical expertise and Risk Mitigation & Management portion of the quotation.

AR 79.  But, because this procurement was to be awarded on a best value basis, "Technical Expertise, and Risk Mitigation and Management . . . [were] of greater importance than Price." AR 75.

**B.   Previous Award Decision and Protest**

The previous award decision and subsequent protest are comprehensively outlined in the Court's decision in *Digiflight*.  *See Digiflight, Inc v. United States*, 165 Fed. Cl. 588 (2023).  As such, only relevant facts and findings are set out below.

4

In response to the first solicitation, the agency received bids from DigiFlight, the Tolliver Group, Inc., and Delta Solutions and Strategies.  AR 462–482.  The Offerors evaluations and price are summarized below:

| OFFERORS | ███████ | **Digiflight** | **Tolliver** |
|---|---|---|---|
| **Technical Expertise** | Acceptable | Acceptable | Acceptable |
| **Risk Mitigation & Management** | Acceptable | Good | Acceptable |
| **Price** | ████████ | $60,275,408.39 | $43,794,113.06 |

AR 479.  None of the Offerors received a strength or weakness in the Technical Expertise Factor, and only DigiFlight received a strength in the Risk Mitigation and Management Factor.   AR 480–81.  DigiFlight's strength was "its thorough ability to Bring[]Together the Right Team."  AR 481.

The initial award determination came down to price.  AR 482–83.  With regard to price, the contracting officer found that DigiFlight's strength did "not justify paying a roughly $16 million price premium."  AR 481–82.   Thus, Tolliver provided the best-value to the government and was awarded the contract.  AR 482.

DigiFlight protested the award decision.  *See Digiflight*, 165 Fed. Cl. 588 (2023).   The Court found that the agency's price realism analysis was irrational because:

> The agency's price realism analysis, at least as documented in the administrative record, essentially consisted of a set of conclusory and repetitive statements with very little explanation or documentation of what, if anything, was actually done to complete this requirement.  For instance, the price evaluation section of the source selection decision, which intermixes both the reasonableness and realism components, states that "[i]n conducting the price evaluation, the government assessed the price quotation to ensure the proposed pricing is realistic for the work to be performed, reflects a clear understanding of the requirements, and is consistent with the various elements of the other parts of the quotation."  AR 489.  Fair enough, but this statement simply restates the requirements of the price realism analysis the agency committed itself to conduct and then, in conclusory fashion, states the agency did in fact conduct such an analysis.  The analysis then reiterates this same conclusion, that "[t]he Government took no exceptions or issues to the Offerors' proposed pricing and found all three to be realistic for the work to be performed.  Additionally, all three Offerors reflect a clear understanding of the requirements."  *Id.*  The Court is left to wonder where the actual analysis is.

*Id.* at 599.  The Court granted the majority of DigiFlight's MJAR and "PERMANENTLY RESTRAINED AND ENJOINED [the government] from awarding a task order under the RFQ at issue in this protest or allowing any contractor to perform under any task order under the RFQ at issue in this protest until a price realism analysis, technical expertise

evaluation, and best value trade-off analysis are performed in a manner that is not inconsistent with this opinion[.]" *Id.* at 613.

## C.   Current Award Decision

Pursuant to the Court's order, the Army reevaluated the quotations.  The following chart shows the result of the reevaluation:

| OFFERORS | | | DigiFlight | Tolliver |
|---|---|---|---|---|
| Technical Expertise | Acceptable | | Good | Acceptable |
| Risk Mitigation & Management | Acceptable | | Good | Acceptable |
| Price | ███████ | | $60,275,408.39 | $43,794,113.06 |

AR 745, 756, 768.

### 1.   Nonprice Factors

█████ rating on nonprice factors remained unchanged, and it was assigned no strengths or weaknesses.  *Id.* at 756–65.  Tolliver's rating on nonprice factors also remained unchanged, but it was assigned one weakness.  *Id.* at 768–77.  The assigned weakness came from Tolliver's response to paragraph 3.2.2.  AR 624.  The evaluation team found that Tolliver's quotation suffered from a "lack of detail with respect to [Tolliver's] ability to provide input and recommendation for efforts [described in Paragraph 3.2.2.]"  AR 625.  The evaluation team noted, however, that even with this lack of detail, "the mission is not likely in danger of being incomplete, as additional Government oversight will enable the Contractor to accomplish the PWS paragraph successfully."  *Id.*  That said, this weakness nevertheless "increase[d] the risk of unsuccessful performance."  *Id.*

By contrast, DigiFlight's quotation fared better on reevaluation.  The rating for the risk mitigation and management factor remained the same, but the evaluation team upgraded DigiFlight's technical expertise from "acceptable" to "good."  AR 605–06.  The rationale for the "good" rating came from a newly assigned strength regarding PWS paragraph 3.1.16.  AR 598.  Specifically, DigiFlight's response to PWS paragraph 3.1.16 "demonstrate[d] a superior understanding of the requirement . . . [and DigiFlight]'s explanation of the JRP, which is how AMCOM is measured on financial execution is noteworthy."  *Id.*  "The JRP process is a part of a key performance indicator for AMCOM audit readiness that is tracked up to the Department of the Army[,]" and DigiFlight's familiarity will assist the ability of AMCOM to meet mandated metrics.  AR 599.  Moreover, DigiFlight "developed the noteworthy PCSII Aviation Reset Tool (RESET) used currently by the AMCOM Field Maintenance Directorate."  *Id.*  These two factors

"provide[] merit to the Government by enabling it to better manage resources more effectively."
*Id.*

      **2. Price Analysis**

      As required by the RFQ, "offers were evaluated for responsiveness to pricing instructions (within established schedule rates, consistency with pricing templates, appropriate level of effort and labor mix), price reasonableness, and price realism."  AR 669.  In conducting the price reasonableness analysis, "[t]he Contracting Officer utilized proposal analysis techniques, including comparison of proposed prices to one another (15.401-1(b)(2)(i)) and comparison of proposed prices to the Independent Government Estimate (FAR 15.404(b)(2)(v))."  AR 671.  The Independent Government Cost Estimate ("IGCE") rates are based on historic labor rates.  AR 674.  The following charts show the analysis and comparison used by the evaluation team and adopted by the contracting officer:

Summary Comparison—not inclusive of the six-month option to extend

| Offeror | ███████ | DigiFlight | Tolliver | IGCE |
|---|---|---|---|---|
| Base Effort & Surge | ███████ | ███████ | ███████ | ███████ |
| Option 1 & Surge | ███████ | ███████ | ███████ | ███████ |
| Option 2 & Surge | ███████ | ███████ | ███████ | ███████ |
| Option 3 & Surge | ███████ | ███████ | ███████ | ███████ |
| Option 4 & Surge | ███████ | ███████ | ███████ | ███████ |
| Option 5 & Surge | ███████ | ███████ | ███████ | ███████ |
| Total | ███████ | $ 52,979,033.82 | $ 38,441,444.81 | $ 64,588,809.63 |

AR 671–72.  The agency noted that "these proposed totals do not exceed the currently exercised rates under their respective GSA schedules and EXPRESS BPA labor rate attachments."  AR 672.

Individual Offerors Labor and Travel Costs

| ███████ | Labor | Travel | ODC | Total |
|---|---|---|---|---|
| Base Effort & Surge | ███████ | ███████ | ███████ | ███████ |
| Option 1 & Surge | ███████ | ███████ | ███████ | ███████ |
| Option 2 & Surge | ███████ | ███████ | ███████ | ███████ |

| | | | | |
|---|---|---|---|---|
| Option 3 & Surge | ███ | ███ | ██ | ███ |
| Option 4 & Surge | ███ | ███ | ██ | ███ |
| Option 5 & Surge | ███ | ███ | ██ | ███ |
| Total | ███ | ███ | ██ | ███ |

*Id.*

| DigiFlight | Labor | Travel | ODC | Total |
|---|---|---|---|---|
| Base Effort &Surge | ███ | ███ | ██ | ███ |
| Option 1 & Surge | ███ | ███ | ██ | ███ |
| Option 2 & Surge | ███ | ███ | ██ | ███ |
| Option 3 & Surge | ███ | ███ | ██ | ███ |
| Option 4 & Surge | ███ | ███ | ██ | ███ |
| Option 5 & Surge | ███ | ███ | ██ | ███ |
| Total | ███ | ███ | ██ | $52,979,033.82 |

*Id.*

| Tolliver | Labor | Travel | ODC | Total |
|---|---|---|---|---|
| Base Effort &Surge | ███ | ███ | ██ | ███ |
| Option 1 & Surge | ███ | ███ | ██ | ███ |
| Option 2 & Surge | ███ | ███ | ██ | ███ |
| Option 3 & Surge | ███ | ███ | ██ | ███ |
| Option 4 & Surge | ███ | ███ | ██ | ███ |
| Option 5 & Surge | ███ | ███ | ██ | ███ |
| Total | ███ | ███ | ██ | $38,441,444.81 |

AR 672–73.   Further, the agency found that

> [a]ll Offerors quoted prices (to include the additional six-month extension) were less than the IGCE. ███ total price of $███ is █% lower than

the IGCE value of $64,588,809.63. DigiFlight's total price of $60,275,408.39 is 7% lower than the IGCE. [Tolliver]'s total price of $43,794,113.03 is 32% lower than the IGCE.

AR 673.

Total Labor Dollars and IGCE with Composite Labor Rate

| Offeror | Total Labor Dollars | Total Hours | Total Composite Labor Rate |
|---------|--------------------|-------------|----------------------------|
| IGCE | $64,488,808.43 | ███ | ███ |
| ███ | ███ | ███ | ███ |
| DigiFlight | $60,175,407.19 | ███ | ███ |
| Tolliver | $43,694,111.86 | ███ | ███ |

*Id.* This procurement is for "programmatic support to the AMCOM Field Maintenance Directorate (AFMD), AMCOM Logistics Center (ALC), and Aviation and Missile Command (AMCOM) such as: resource management; cost estimating/analysis and budget preparation; program management, plans, and integration; schedule development and assessment; strategic planning; risk analysis; and risk mitigation." AR 14; *see also* AR 23. As such, labor hours are the main price driver in this contract. The evaluation team found that all the offerors submitted labor mixes that met the solicitations criteria. AR 669–671.

### a. FAR 15.404-1(b)(2)(i) Price Comparison

The contracting officer also used "the preferred proposal analysis technique of comparison of proposed prices in accordance with FAR Subpart 15.404-1(b)(2)(i)." AR 673. The FAR, in relevant part, provides that "[t]he Government may use various price analysis techniques and procedures to ensure a fair and reasonable price. Examples of such techniques include, but are not limited to, the following: [c]omparison of proposed prices received in response to the solicitation. Normally, adequate price competition establishes a fair and reasonable price. 48 C.F.R. §§ 15.404-1(b)(2),15.404-1(b)(2)(i). The contracting officer found that "[t]hree responsible offerors, appearing to have competed independently, submitted priced offers that satisfy the Government's expressed requirement." AR 673. Furthermore, in accordance with FAR 15.403(c)(1)(A), he found adequate price competition existed. *Id.* Although the contracting officer noted that DigiFlight "was priced significantly higher than the other two Offerors," he "believe[d] the presence of price competition motivated reasonable pricing from DigiFlight." AR 673–74. Ultimately, he attributed the pricing variance to varied proposal strategies. AR 674.

### b. Price Realism

As required by the solicitation and the FAR, the contracting officer conducted a price realism analysis to "ensure[] the proposed pricing is realistic for the work to be performed." *Id.* To do so he "used the GSA Contract Awarded Labor Categories (CALC) tool to substantiate the review of labor category prices offered by all three Offerors." *Id.* In doing the price realism analysis, "the Contracting Officer conducted an analysis of proposed labor rates to support the price realism assessment . . . ." AR 686. "The Contracting Officer compared rates from the Offeror's quote with the collection of GSA Multiple Award Schedule (MAS) rates captured in GSA's [CALC] tool databased located at <u>Pricing (gsa.gov)</u>." *Id.* The CALC tool "captures the not-to-exceed, ceiling prices, that are established with all order sizes, types, complexities, geographical, etc. taken into consideration . . . ." *Id.* "To facilitate the assessment, the Contracting Officer searched the CALC Tool for quoted Labor Categories (LCAT) to find the range of corresponding GSA schedule ceiling rates." *Id.* For each proposal, the contracting officer provided a histogram and analysis of each proposed LCAT, and he analyzed where the price was in relation to the mean price from the CALC tool. *Id.*; *see also* AR 688–744. For Tolliver, the comparison showed nine of the GSA rates were above the mean and the rest of their GSA rates were below the mean, and a few (both discounted and undiscounted rates) fell below one standard deviation of the mean. AR 688–711. For ▇▇▇, the comparison found four of their GSA rates were above the mean and the rest fell below the mean, and a few (both discounted and undiscounted rates) fell below one standard deviation of the mean. AR 713–26. Finally, for DigiFlight, the comparison showed ten of DigiFlight's undiscounted rates were above the mean, five undiscounted rates were below the mean, and a few were one standard deviation outside of the mean. AR 727–44. While the contracting officer found the prices were realistic, he also stated "the rates were competitively, *perhaps even aggressively, priced (particularly* ▇▇ *and [Tolliver])*, they were not so aggressive as to be impossible or implausible for the given categories." AR 674 (emphasis added). Moreover, the contracting officer believed that labor categories could be filled at the given rates without unduly risking successful performance of the contract. *Id.*

### 3. Best Value and Tradeoff

Finally, the contracting officer conducted a tradeoff determination to conclude which offeror gave the agency the best value. In so doing, he "conducted an independent comparative assessment of the Offerors' quotations under the Price and Non-price factors given their respective importance set forth in the [solicitation]." AR 677. He then adopted the evaluation team's findings and ratings on the non-price factors. *Id.* The contracting officer found that, in considering the Technical Expertise and Risk Mitigation and Management factors together, "DigiFlight provide[d] the best approach of the three offerors." *Id.* at 682. The contracting officer highlighted three reasons to support his determination to pay the price premium:

1)  All the prices offered are below what the Government estimated it would pay at the beginning of this source selection. While the price to obtain DigiFlight's services is significantly higher than [Tolliver] and ▇▇▇, the Government is still paying less than its internal estimate of $64,588,809.63. Therefore, even though DigiFlight has the highest price, the Government will still realize cost savings of over $4

million by awarding to DigiFlight. The Contracting Officer considers that the price premium paid to DigiFlight is of minimal concern since the Government will still receive services for less money than it was willing to pay at the beginning of the source selection.

2) Although on paper [Tolliver] presents a cost savings to the Government of approximately $15 million in comparison to DigiFlight, the weakness assigned in the budgeting and cost estimating areas raises the risk that the Government will pay more and expend more resources (increased manpower for oversight), if it awards to [Tolliver]. While [Tolliver] quoted price is reasonable and realistic, the Government has concern that the $15 million difference between [Tolliver] and DigiFlight will shrink over the five years of this task if all options are exercised. Further, the lower risk of resource expenditure and the ability for DigiFlight to leverage its reach back capability in providing personnel provides the Government with confidence that DigiFlight's quoted price is much firmer than [Tolliver]'s quoted price.

3) While ████████ does not contain the same weakness as [Tolliver], its risk of unsuccessful performance is still moderate. The confidence provided to the Government by DigiFlight's approach in both Technical and Risk Mitigation and Management carries with it a lower risk of unsuccessful performance. In the Contracting Officer's judgment, the lower risk of unsuccessful performance is worth the price premium, especially since the Government will still save money by awarding to DigiFlight.

AR 682–683. Moreover, "[a]lthough all offerors could perform the task, DigiFlight's approach to both Technical Expertise and Risk Mitigation and Management provide[d] the least amount of unsuccessful contract performance risk to the Government." AR 682. While Tolliver presented a significant advantage over DigiFlight in price, "the Price Factor [was] the least important and [was] not expected to be the controlling criterion in this selection." *Id.* The contracting officer determined that "price truly is the least important criteria in this source selection due to the significant difference between the evaluation results in the other criteria." *Id.* As such, the contracting officer believes "the benefits of the higher priced quotation warrant the additional price." AR 684. Thus, DigiFlight—according to the contracting officer—offers the government the best value. *Id.*

## D.   Current Protest

The current protest is the flip side of the previous protest over this procurement with Tolliver, the previous awardee, now challenging the award to DigiFlight, the previous protestor. Tolliver filed this instant action on January 4, 2024, alleging three counts. *See generally* ECF No. 1. Tolliver filed an amended complaint on January 23, 2024, alleging two counts. *See generally* ECF No. 30 ("Am. Compl."). First, Tolliver argues the Army failed to perform and document a rational price reasonableness analysis. Am. Compl. ¶¶ 44, 45. Second, Tolliver

alleges that the tradeoff analysis was unreasonable, mainly because it was based on a flawed price reasonableness evaluation.  *Id.* ¶¶ 102–15.

In support of its allegations, Plaintiff argues that the agency improperly applied the price analysis techniques.  Plaintiff, relying heavily on *Serco Inc. v. United States*, 81 Fed. Cl. 463 (2008), argues that the agency cannot rely on adequate price competition to establish price reasonableness if one price is inconsistent with the other prices.  ECF No. 31 at 8–10 ("Pl.'s MJAR").  In response to the contracting officer's conclusion regarding pricing strategies causing the price variance, Tolliver points out that "labor rates are the major cost drivers in this acquisition," and DigiFlight and Tolliver were only separated by 15 hours.  Pl.'s MJAR at 11– 12.  This, according to Tolliver, means that 1) the only reasonable conclusion "is that DigiFlight and Tolliver proposed essentially the same staffing solution[,]" and 2) "[t]he significant pricing differences comes from the difference in proposed rates."  *Id.* at 12.  When reviewing the proposed prices, Tolliver argues that because it only offered $11.6 million in discounts, as opposed to $███████ from ███████ and $21 million from DigiFlight, the contracting officer's assertion that Tolliver was trying to buy in to the work cannot be supported.  *Id.* at 12–13. Tolliver's final attack on the price comparison rests on Department of Defense's 8.404(d) requirement.[3]  *Id.* at 14–15.  Essentially, Tolliver argues that this requirement was not followed because contracting officer "piggyback[ed] on earlier findings at the Schedule or BPA level" instead of making the fair and reasonable determination at the order level.  *Id.* at 15.  Tolliver attacks the IGCE because in its view "[the Administrative Record] never shows the contracting officer relying on [the IGCE] to make a fair and reasonable determination.  *Id.* at 16.  Relying almost exclusively on *Nutech Laundry & Textile v. United States*, 56 Fed. Cl. 588 (2003), Tolliver argues the IGCE "has no narrative or analytical detail. . . .  It is simply an unexplained spreadsheet[,]" and because of that the contracting officer failed to meet his obligation under the AFARS "to ensure it had the detail needed to support its preparation."  Pl.'s MJAR at 18. Finally, because of the above-identified issues with the price reasonableness analysis, Tolliver argues it "permeated the tradeoff decision too."  *Id.* at 23.

On February 22, 2024, the Court held oral argument on the pending motions, and the matter is now ripe for consideration.

---

[3] FAR 8.404(d) says "Supplies offered on the schedule are listed at fixed prices.  Services offered on the schedule are priced at either hourly rate, or at a fixed price for performance of a specific task (e.g., installation, maintenance, and repair).  GSA has determined the prices of supplies and fixed-priced services, and rates for services offered at hourly rates, to be fair and reasonable for the purpose of establishing the schedule contract.  GSA's determination does not relieves the ordering activity contracting officer from the responsibility of making a determination or fair and reasonable pricing for individual orders, BPAs, or orders under BPAs, using the proposal analysis techniques at 15.404-1.  The complexity and circumstances of each acquisition should determine the level of detail of the analysis required."  *See* OFFICE OF THE UNDER SECRETARY OF DEFENSE, *Class Deviation—Determination of Fair and Reasonable Prices When Using Federal Supply Schedule Contracts* (March 13, 2014), https://www.acq.osd.mil/dpap/policy/policyvault/USA001004-14-DPAP.pdf ("Deviation").

**DISCUSSION**

A.     **Legal Standard**

The Tucker Act, as amended by the Administrative Dispute Resolution Act, provides the Court with "jurisdiction to render judgement on an action by an interested party objecting to a solicitation by a federal agency for bids or proposal for a proposed contract or to a proposed award or to the award of a contract or any alleged violation of statue or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).  In such actions, the Court "shall review the agency's decision pursuant to the standards set forth in section 706 of title 5." 28 U.S.C. § 1491(b)(4).  Accordingly, the Court examines whether an agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706.  Agency action is irrational if "the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or . . . is so implausible that it could not be ascribed to a difference in view of the product of agency expertise.'" *Ala. Aircraft Indus., Inc-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Critically, when reviewing the agency's procurement decisions, the Court cannot "substitute its judgment for that of the agency." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971).  But "a court may affirm the decision of an agency on a ground other that the ground given by the agency, so long as it is clear that the agency would have reached the same decision if it had been aware that the ground it invoked was legally unavailable, or if the decision does not depend on making a finding of fact not previously made by the agency." *Oracle Am., Inc. v. United States*, 975 F.3d 1279, 1291 (Fed. Cir. 2020) (citations omitted).

Bid protests are generally decided on cross-motions for judgment on the administrative record, pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"), which requires the Court to "make factual findings from the record evidence as if it were conducting a trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1354 (Fed. Cir. 2005).  "Unlike a motion for summary judgment, a genuine dispute of material fact does not preclude a judgement on the administrative record." *Sierra Nevada Corp. v. United States*, 107 Fed. Cl. 735, 751 (2012).  Therefore, in reviewing cross-motions for judgment on the administrative record, "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *Jordan Pond. Co., LLC v. United States*, 115 Fed. Cl. 623, 630 (2014).

Under such review, "[a] bid award may be set aside if (1) the procurement official's decision lacked a rational basis or (2) the procurement procedure involved a violation of regulation or procedure." *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1308 (Fed. Cir. 2021) (internal quotations omitted).  On the first ground, "the courts have recognized that contracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citations and internal quotations omitted).  Thus, the Court must "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, . . . and the disappointed bidder bears a heavy burden of

13

showing that the award decision had no rational basis." *Id*. at 1332–33 (internal citations and quotations omitted); *see also Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009). Moreover , agency decisions are "entitled to a presumption of regularity." *Impresa Contruzioni Geom. Domenico Garufi*, 238 F.3d at 1338. "When a challenge is brought on the second ground, the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" *Id.* (quoting *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)). As such, the Court is only to intervene when the agency action is unreasonable. *Digiflight*, 165 Fed. Cl. at 598.

Finally, the Court reviews the administrative record as a whole. 5 U.S.C. § 706 ("In making the foregoing determinations, the court shall review the whole record. . . .") The whole administrative record "consists of all documents and materials *directly or indirectly* considered by agency decision makers[.]" *Trace Sys. Inc. v United States*, 160 Fed. Cl. 691, 694 (emphasis added) (internal quotations omitted).

## B.    Analysis

In this bid protest, Tolliver challenges the agency's price reasonableness analysis and resultant best value determination as being irrational. The agency's price reasonable analysis and best value determination are both contained in a document appropriately titled: "Best Value and Fair and Reasonable Determination." AR 637–685. In arguing that the agency erred in its price reasonableness analysis and further erred in determining that DigiFlight's quote presented the best value to the government, Tolliver urges the Court to focus on particular sentences, paragraphs, and/or subsections of the Best Value and Fair and Reasonable Determination rather than to examine the agency's determinations based on the whole document. While Tolliver's approach may reveal some weaknesses in the agency's explanation of price reasonableness and best value, the problem for Tolliver is that when viewed as a whole the Best Value and Fair and Reasonable Determination reveals that both the agency's price reasonableness analysis and best value determination were rational. In other words, although Tolliver identified some issues with the agency's explanations of the challenged determinations, the isolated issues identified by Tolliver are insufficient to meet its burden of demonstrating that either the agency's price reasonableness analysis or best value determination were irrational.

## 1.    Tolliver Failed to Demonstrate that the Contracting Officer Acted Irrationally by Determining that DigiFlight's Price was Reasonable

The solicitation required the agency to analyze whether the offerors' proposed prices were reasonable as part of its price evaluation. AR 78 ("The [g]overnment will use price analysis to determine the overall price reasonableness."). Tolliver does not contend in its motion for judgment on the administrative record that the agency failed to conduct a price reasonableness analysis; rather, Tolliver takes issue with two aspects of the price reasonableness analysis that was conducted. First, Tolliver argues that "[b]ecause DigiFlight's price was an outlier, comparing competitors' prices did not support the contracting officer's fair and reasonable finding, and [the contracting officer] made matters worse by relying on the comparison anyway." Pl.'s MJAR at 8–15. Second, Tolliver asserts that the "IGCE is unreasonable, and does not give the contracting officer a rational basis for finding DigiFlight's

14

pricing fair and reasonable." *Id.* at 16–23.  For these two reasons, Tolliver maintains that "[t]he contracting officer had no rational basis for concluding that DigiFlight's price was fair and reasonable." *Id.* at 7.

In assessing Tolliver's arguments, the Court is mindful that the agency is best suited to assess whether an offeror's proposed price is reasonable. *Serco*, 81 Fed. Cl. at 495 ("[T]he depth of an agency's price reasonableness analysis and its ultimate findings on that count are both matters of discretion.").  Moreover, as long as the agency had a rational basis for reaching its price reasonableness conclusion, the Court must uphold the finding.  *Moore's Cafeteria Servs. v. United States*, 77 Fed. Cl. 180, 186–87 (2007) (citing cases).  In other words, to be successful in its protest, Tolliver must show that the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or . . . is so implausible that it could not be ascribed to a difference in view of the product of agency expertise." *Ala. Aircraft Indus., Inc-Birmingham*, 586 F.3d at 1375 (internal quotations omitted).  Because Tolliver failed to show that the contracting officer acted irrationally in his application of the applied price analysis techniques, Tolliver's challenge to the agency's price reasonableness determination necessarily fails.  *See Turner Const. Co. v. United States*, 645 F.3d 1377, 1383 (Fed. Cir. 2011) ("When an officer's decision is reasonable, neither a court nor the GAO may substitute its judgment for that of the agency.").

### a.  The contracting officer properly applied FAR 15.404-1(b)(2) to determine that DigiFlight's price was reasonable

The first price analysis technique the contracting officer used to evaluate proposed prices for reasonableness was to follow FAR 15.404-1(b)(2) by both comparing the proposed prices to each other and determining that adequate price competition existed. *See* 48 C.F.R. § 15.404-1(b)(2)(i).  FAR 15.404-1(b)(2)(i) provides that "to ensure a fair and reasonable price" an agency may conduct a "[c]omparison of proposed prices received in response to the solicitation." Additionally, FAR 15.404-1(b)(2)(i) states that "[n]ormally, adequate price competition establishes a fair and reasonable price (see 15.403-1(c)(1))." *Id.*  Thus, this provision: (1) allows a contracting officer to determine that prices are fair and reasonable by comparing the proposed prices to each other so long as that comparison is rational; and (2) provides that determining that there is adequate price competition, as defined by FAR 15.403-1(c)(1), *normally* establishes that proposed prices are fair and reasonable.

With regard to price comparison, the administrative record clearly shows that the contracting officer undertook a robust price comparison to determine that all the prices submitted were fair and reasonable:

| Offeror | ███████ | DigiFlight | Tolliver | IGCE |
|---|---|---|---|---|
| Base Effort & Surge | ███████ | ███████ | ███████ | ███████ |
| Option 1 & Surge | ███████ | ███████ | ███████ | ███████ |
| Option 2 & Surge | ███████ | ███████ | ███████ | ███████ |
| Option 3 & Surge | ███████ | ███████ | ███████ | ███████ |
| Option 4 & Surge | ███████ | ███████ | ███████ | ███████ |
| Option 5 & Surge | ███████ | ███████ | ███████ | ███████ |
| Total | ███████ | $ 52,979,033.82 | $ 38,441,444.81 | $ 64,588,809.63 |

AR 671–72.   As part of this price comparison, the contracting officer also broke down the costs for the individual bidders based on three categories, labor, travel, and other direct costs:

| ███████ | Labor | Travel | ODC | Total |
|---|---|---|---|---|
| Base Effort & Surge | ███████ | ███████ | ███████ | ███████ |
| Option 1 & Surge | ███████ | ███████ | ███████ | ███████ |
| Option 2 & Surge | ███████ | ███████ | ███████ | ███████ |
| Option 3 & Surge | ███████ | ███████ | ███████ | ███████ |
| Option 4 & Surge | ███████ | ███████ | ███████ | ███████ |
| Option 5 & Surge | ███████ | ███████ | ███████ | ███████ |
| Total | ███████ | ███████ | ███████ | ███████ |

*Id.* at 672.

| DigiFlight | Labor | Travel | ODC | Total |
|---|---|---|---|---|
| Base Effort & Surge | ███████ | ███████ | ███████ | ███████ |
| Option 1 & Surge | ███████ | ███████ | ███████ | ███████ |
| Option 2 & Surge | ███████ | ███████ | ███████ | ███████ |
| Option 3 & Surge | ███████ | ███████ | ███████ | ███████ |
| Option 4 & Surge | ███████ | ███████ | ███████ | ███████ |
| Option 5 & Surge | ███████ | ███████ | ███████ | ███████ |
| Total | ███████ | ███████ | ███████ | $52,979,033.82 |

*Id.*

| Tolliver | Labor | Travel | ODC | Total |
|---|---|---|---|---|
| Base Effort &Surge | ███ | ███ | ███ | ███ |
| Option 1 & Surge | ███ | ███ | ███ | ███ |
| Option 2 & Surge | ███ | ███ | ███ | ███ |
| Option 3 & Surge | ███ | ███ | ███ | ███ |
| Option 4 & Surge | ███ | ███ | ███ | ███ |
| Option 5 & Surge | ███ | ███ | ███ | ███ |
| Total | ███ | ███ | ███ | $38,441,444.81 |

AR 672–73.  The contracting officer also ran similar breakdowns for each company with the six-month extension option included in the analysis.  AR 675–76.  In addition, the contracting officer also compared the Total Labor Dollars and Composite Labor rate for each offeror as well as with the IGCE:

| Offeror | Total Labor Dollars | Total Hours | Total Composite Labor Rate |
|---|---|---|---|
| IGCE | $64,488,808.43 | ███ | ███ |
| ███ | ███ | ███ | ███ |
| DigiFlight | $60,175,407.19 | ███ | ███ |
| Tolliver | $43,694,111.86 | ███ | ███ |

AR 673.

The above charts show the contracting officer, using a FAR approved technique, compared the prices quoted by the offerors in order to determine that all quoted prices were reasonable.  Although the contracting officer found that Tolliver's and ███ prices were "roughly 26%-28% lower than DigiFlight," he attributed the variance to strategic decisions made by the offerors.  *Id.* at 673–74 ("Although the pricing variance is significant, much could be contributed simply to varied strategies (e.g., competing on price versus competing on technical capability.").  In the end, he still concluded, after his lengthy price comparison, that all prices

were reasonable. *Id.* at 674. For the Court to find otherwise would result in the Court "substitut[ing] its judgment for that of the agency." *Citizens to Preserve Overton Park*, 401 U.S. at 416. Without Tolliver showing that this conclusion is irrational, this alone is enough to end the analysis and uphold the price determination.

In addition to conducting a price comparison, the contracting officer also determined that that adequate price competition existed. AR 673–74. As set forth in the FAR, "normally," if adequate price competition exists, it alone establishes price reasonableness. 48 C.F.R. § 15.404-1(b)(2)(i) ("Normally, adequate price competition establishes a fair and reasonable price (see 15.403-1(c)(1))."). The FAR provides that adequate price competition exists if:

> (A) Two or more responsible offerors, competing independently, submit priced offers that satisfy the Government's expressed requirement;

> (B) Award will be made to the offeror whose proposal represents the best value (see 2.101) where price is a substantial factor in source selection; and

> (C) There is no finding that the price of the otherwise successful offeror is unreasonable. Any finding that the price is unreasonable must be supported by a statement of the facts and approved at a level above the contracting officer.

48 C.F.R. § 15.403-1(c)(1)(i).

The administrative record documents that the contracting officer determined that adequate price competition existed:

> Three responsible offers, appearing to have competed independently, submitted priced offers that satisfy the Government's expressed requirement. As award will be made to the offeror whose proposal represents the best value and there is no finding the price of the otherwise successful offeror is unreasonable, and the Contracting Officer has determined adequate price competition in accordance with FAR 15.403(c)(1)(A).

AR 673. In short, the agency determined that all three prongs of adequate price competition existed.

Therefore, at least facially, the contracting officer complied with the two price analysis techniques prescribed by FAR 15.404-1(b)(2)(i) and determined that the submitted prices were reasonable. Accordingly, to overcome these determinations, Tolliver must demonstrate that the contracting officer acted irrationally in comparing the offerors' proposed prices or in determining that adequate price competition existed in order to successfully challenge the agency's determination that all submitted prices were reasonable under FAR 15.404-1(b)(2)(i). To that

18

end, Tolliver challenges individual aspects of each of those determinations in an attempt to show the contracting officer acted irrationally.  Pl.'s MJAR at 7–15.

First, Tolliver argues, based on its reading of the text of FAR 15.404-1(b)(2)(i), that "the technique of comparing proposed prices under FAR Subpart 15.404-1(b)(2)(i) . . . can only be used when there is 'adequate competition.'"  *Id.* at 8 (quoting AR 673).  The text of FAR 15.404-1(b)(2)(i), however, does not support Tolliver's argument.  Rather, that FAR provision provides that "[c]omparison of proposed prices received in response to the solicitation" is one acceptable price analysis technique and, *in addition*, that "[n]ormally, adequate price competition establishes a fair and reasonable price (see 15.403-1(c)(1))."  48 C.F.R. § 15.404-1(b)(2)(i).  In other words, the provision does not limit using "[c]omparison of proposed prices received" to those situations in which there is adequate price competition as defined in FAR 15.403-1(c)(1).  Tolliver's assertion rests on a misreading of the second sentence of the provision.  The technique described in FAR 15.404-1(b)(2)(i) allows the government to compare prices to determine if the prices are fair and reasonable.  It does not require a threshold finding that there is adequate price competition in order to compare offerors' prices to one another.  That is to say, FAR 15.404-1(b)(2)(i) does *not* state: *if* there is adequate price competition, *then* a comparison of proposed prices received in response to the solicitation may be used to establish price reasonableness.  Instead, it leaves open the possibility that prices can be compared absent adequate competition but confirms that, under normal circumstances, if there is adequate price competition, then price reasonableness exists.  Thus, although a protestor may challenge the determination that results from a comparison of prices in which the definition of adequate price competition is not met, it is not correct that a comparison of proposed prices is automatically irrational if there was not adequate price competition.

Moving on from its incorrect textual argument, Tolliver next challenges the contracting officer's finding of adequate price competition itself, asserting that "he misapplied the test in FAR 15.404-1(b)(2)(i) because DigiFlight's price did not compare favorably to other competitors."  Pl.'s MJAR at 7–8.  In support, Tolliver argues that *Serco Inc. v. United States*, 81 Fed. Cl. 493 (2008), requires the Court to find that the contracting officer misapplied this price analysis technique.  *Id.* at 9–10.  Attempting to bolster its argument, Tolliver refers to DigiFlight's price as "a significant outlier."  *Id.* at 9.  Because of this alleged outlier status, Tolliver argues the contracting officer, "[r]ather than conclude that the price comparison did not support a fair and reasonable finding, offered several reasons to explain away the 'significant' price difference."  *Id.* at 10.  To even consider applying *Serco* here, it is important to understand the peculiar facts critical to the price analysis that was at issue there.  As Judge Damich observed in *SupplyCore Inc. v. United States*:

> Discussing the applicability of *Serco* requires some factual excavation of that case.  Underlying *Serco* was a solicitation awarded by the GSA to provide technology products and services to the entire Federal Government.  The solicitation specified that technical factors would be 'significantly more important than cost or price,' but also added that 'the closer the technical scores of the various proposal are to one another, the more important cost or price considerations become in determining the overall best value for the government.' *Id.* at 466–67.  The solicitation yielded 62 offerors whose bids, if technically proximate, were supposed to be evaluated for

price.  *See id.* at 465–67. . . . The GSA selected 29 awardees, included the 28 offerors with the best technical proposals.  *Id.* at 477.  *The prices of the offerors (and the awardees) were wildly disparate, ranging from well beneath the [Independent Government Cost Estimate] to far above it—some awardees' prices were more than double the price of the lowest-priced awardee. Id.* at 492.  GSA purportedly evaluated every offered price as "fair and reasonable," and also issued awards to the 59th, 60th, and 61st-highest bidders out of 62 (i.e., three of the four highest of the 62 offers were selected).  *Id.*  In conjunction with this, every price analysis concluded: "In relation to the IGCE for overall price and Mean Overall Price among all offerors (Government and Contractor Site combined over 10 years), the Offeror's Mean Overall Price is in line with adequate price competition and is, therefore, considered fair and reasonable."  *Id.* at 495.  In other words, despite the dramatic variance in the pricing among the different offers and also between the offers and the IGCE, GSA still represented, uniformly, that each offeror's pricing was 'in line with adequate price competition' 'even when [GSA's] own statistics demonstrated they were not.'  *Id.*  The Court held that this clearly illogical representation triggered a decision that GSA's price reasonableness analysis was arbitrary and capricious because, apparently, *there was "no price reasonableness analysis at all.*" *Id.* . . .  However, in fact, the *Serco* Court's finding that GSA's price reasonableness analysis was arbitrary and capricious obviously hinges on a contradiction in the agency's finding: the finding espoused to reflect "the IGCE for overall price and the Mean Overall Price among all offerors" and then found each offeror's pricing fair and reasonable in relation to these—which is difficult to rationalize given the actual range and volatility of all the offeror's pricing.

No. 21-1861C, 2021 WL 6340188, at *12 (Fed. Cl. Dec. 28, 2021) (emphasis added).

Put simply, this case is not *Serco*.  DigiFlight's pricing is not even arguably an outlier in the same sense of what constituted an outlier in *Serco*.  For instance, DigiFlight's price is not two standard deviations above the mean of the submitted prices, like some of the prices at issue in *Serco*, DigiFlight's pricing is lower than the IGCE; and almost all of its discounted labor rates by category were lower than the mean of the rates for those labor categories from the GSA Multiple Award Schedule contracts compiled in the GSA CALC tool.  AR 727–44.  As outlined by Judge Damich above, the facts related to pricing at issue in *Serco* were unique.  In this case, there are only three offerors, and the administrative record makes clear there was an actual price analysis done to ensure all prices were fair and reasonable.  AR 671–73.  Unlike in *Serco*, in which the agency—against the backdrop of vast pricing disparity that the agency's own statistics demonstrated was not in line with adequate price competition—found all prices to be fair and reasonable, 81 Fed. Cl. at 495, the contracting officer here conducted a comparison, recognized the pricing variance, and attributed the variance to potential strategic choices addressed in the tradeoff decision.  AR 673–74.  Tolliver argues that this explanation—"[choosing to] compet[e] on price versus competing on technical capability," AR 674—is not supported by the record.  Pl.'s MJAR at 11–14.  According to Tolliver "the **only** explanation that this record supports is that DigiFlight's GSA Schedule rates are so high that even with a more aggressive discount

20

strategy than Tolliver, DigiFlight is still 38% higher.  It was unreasonable for the contracting officer to come to any other conclusion." *Id.* at 14 (emphasis in original).

The Court disagrees with Tolliver's analysis of the administrative record on this point. Contrary to Tolliver's assertion, the record shows that the agency determined that DigiFlight offered superior "technical capability" to Tolliver.  This is evident, for instance, in the discussion in the contracting officer's best-value and tradeoff determination, which recognized that DigiFlight's strengths justified its higher cost.  AR 683–84.  DigiFlight received a "good" rating on both Technical Expertise and Risk Mitigation and Management.  AR 676.  These "good" ratings mean that, for these two categories, DigiFlight's "[q]uotation meets requirements and indicates a thorough level of expertise and an understanding of the requirements.  Strengths outweigh any weaknesses.  Risk of unsuccessful performance is low."  AR 76.  It was rational for the contracting officer to determine that DigiFlight's strengths resulted from the higher priced personnel DigiFlight proposed.  The contracting officer knew—especially from his detailed price realism analysis, *see* AR 686–744—that DigiFlight's personnel are generally priced at a higher rate than those proposed by Tolliver and ▮▮▮▮  He also knew that DigiFlight received a "good" rating on both Technical Expertise and Risk Mitigation.  AR 676.  Putting this information together, it was reasonable for the contracting officer to conclude that the pricing variance was likely the result of some offerors—namely Tolliver and ▮▮▮▮—"[choosing to] compet[e] on price versus competing on technical capability."  AR 674.  Contrary to its assertions, Tolliver has failed to show that "there is no rational connection between the contracting officer's comparison in this case and his conclusion."  ECF No. 37 at 4–5.  Instead, the contracting officer acknowledged the price difference between DigiFlight and the other two offerors and attributed it to various pricing strategies.  AR 674.  These strategies align with the contracting officer's findings in the best-value and tradeoff determination, *id.* at 682–84, and the ratings from the Technical Expertise and Risk Mitigation and Management evaluations, AR 676.  As a result, the Court finds the agency's decision rational.  *See Technatomy Corp. v. United States*, 144 Fed. Cl. 388, 390 (2019) (upholding a price reasonableness analysis, in part, because it provided sufficient explanation for pricing variance).

Moreover, although Tolliver insists that "to be found fair and reasonable in comparison with other proposed prices, the price being assessed *either* must be consistent with those other prices or favorably compare with those other prices,"  Pl.'s MJAR at 9 (citing *Newimar, S.A. v. United States*, 160 Fed. Cl. 97, 133 (2022)), even if the Court were bound by this reasoning, Tolliver has failed to carry its burden to show the proposed prices are inconsistent.  Certainly, DigiFlight's proposed price is higher than the prices proposed by Tolliver and ▮▮▮ but the "rule" Tolliver asks this Court to apply clearly states in the disjunctive that "the price being assessed *either* must be consistent with those other prices *or* favorably compare to those prices." *Id.* (emphasis in the original).  Tolliver even italicized the word "either" in its brief.  But Tolliver then argued only that DigiFlight's proposed price does not "favorably compare" to the other two proposed prices.  For example, Tolliver summarizes its argument on this point as follows: "Section A below explains that he misapplied the test in FAR 15.404-1(b)(2)(i) because DigiFlight's price did not compare favorably to other competitors." *Id.* at 7–8. It concludes the argument by stating "[i]n other words, DigiFlight's price did not compare favorably to the other competitors."  *Id.* at 10.  But demonstrating that DigiFlight's price did not favorably compare is

not enough because such a showing would only satisfy half of the "rule" Tolliver urges the Court to apply.

Additionally, even to the extent that labeling DigiFlight's price as an "outlier" in the subsection header could be considered addressing the "consistency" aspect of the "rule," a conclusory statement that the price is an outlier is insufficient to establish the price is inconsistent given the other evidence in the record. First, any alleged inconsistency between the prices has to be considered in context. For instance, as part of its argument that DigiFlight's price did not favorably compare to the others, Tolliver points to the contracting officer's statement that DigiFlight's proposed price was priced "rather significantly higher" than the other two Offerors." *Id.* (citing AR 673). However, in context, the contracting officer is actually concerned that the prices of all three offerors were found to be aggressively priced: "[a]lthough the rates were competitively, *perhaps even aggressively, priced* (particularly ▮ and [Tolliver]), they were not so aggressive as to be impossible or implausible for the given categories . . . ." AR 674 (emphasis added). In other words, the contracting officer was actually concerned that the proposed prices of all three offerors may be too low or unrealistic for the work to be performed and thus the prices of all three offerors were consistently priced in an aggressive manner.[4] Furthermore, DigiFlight's allegedly "outlier" price was within two standard deviations of the mean of the three proposed prices and less than half a standard deviation of the mean when the IGCE is included. *See Serco Inc.*, 81 Fed. Cl. at 465 (finding irrational GSA's decision to make "awards to offerors whose prices were 59th, 60th and 61st out of the sixty-two offers—prices that the agency claims were 'fair and reasonable' despite being twice as high as the lowest winning offer, as much as thirty percent higher than the independent government cost

---

[4] Tolliver places substantial weight on the description by the contracting officer of DigiFlight's price as "significantly higher than the other two Offerors." AR 673. According to Tolliver, this acknowledgment makes DigiFlight's price a significant outlier, and dooms the price reasonableness analysis. Pl.'s MJAR at 9–10. But Tolliver's argument fails to consider the "significantly higher" finding in context with the rest of the Best Value and Fair and Reasonable Determination. It is clear from the administrative record that while the contracting officer's chief concern is with price *realism*, he has real knowledge about all of the offeror's pricing down to the discounted hourly pricing for each labor category. AR 686–744. A significant number of all of the offeror's discounted hourly pricing for each labor category are below the mean for the corresponding labor category in the GSA CALC tool. *Id.* Additionally, many of the offeror's discounted hourly pricing for each labor category is below the IGCE rate. *Compare* AR 45 *with* AR 688–743. Furthermore, in the subsection of the price evaluation directly after the "significantly higher" sentence, the contracting officer stated "[a]lthough the rates were competitively, *perhaps even aggressively, priced* (particularly ▮ and [Tolliver]), they were not so aggressive as to be impossible or implausible for the given categories and the Contracting Officer's judgment was the positions could be filled at the given rates with performance not unduly risked." AR 674 (emphasis added). The contracting officer is concerned with these prices potentially being too low, especially when the agency had just lost a protest for an inadequate documentation of price realism. *See generally DigiFlight*, 165 Fed. Cl. 588 (2023). Tolliver would have the Court ignore the documented knowledge of the proposed prices that the contracting officer gained from his price realism analysis when reviewing the agency's price reasonableness analysis. But it is clear from the price realism analysis that the contracting officer did not believe that DigiFlight's price could be unreasonable because he is actually concerned that it may be unrealistic. It does not seem possible that a price could be both so aggressively priced, bordering on unrealistic, while also being so significantly high that it was, as Tolliver argues, unreasonable.

estimate, and more than two standard deviations to the mean of the evaluated prices for all the offerors").

Moreover, as Judge Roumel has noted, the issue in *Serco* "was th[e] blind attribution of reasonableness in the face of statistical evidence—that prices were more than two standard deviations above the mean 'suggesting that they were truly outliers'—that led the Court to hold the agency's price reasonableness analysis improper." *Newimar S.A.*, 160 Fed. Cl. at 136 (quoting *Serco*, 81 Fed. Cl. at 492). Tolliver even recognizes this stating "Judge Roumel concluded that the holding in *Serco* means that the comparison between competitors must be used to identify outliers." Pl.'s. MJAR at 9. But the administrative record, taken as a whole, shows that the contracting officer did just that. For example, not only did the contracting officer compare the prices to each other and the IGCE, as shown in the charts above, but he also compared all the offerors' proposed rates for each labor category to the mean rates produced by the GSA CALC tool and identified those that were above the mean, below the mean, and those that were one standard deviation either above or below the mean for each company. AR 686–744. While this analysis was done as part of a price realism analysis, the Court cannot discount the in-depth review undertaken by the contracting officer even if some of his analysis was intended to determine realism rather than reasonableness. *Frawner Corp. v. United States*, 161 Fed. Cl. 420, 459 (2022) (citations omitted) ("Rather, an agency is permitted to use its knowledge and expertise during the procurement process, including in its evaluation of price reasonableness.").

Thus, even accepting the above-quoted rule to be correct, there was a rational basis for the contracting officer to believe all the prices were consistent, and Tolliver has not directed the Court to anything from which to deviate from the contracting officer's finding, other than pointing to one sentence in which the contracting officer described the price variance as significant while, at the same time, explaining the variance. And, as mentioned above, Tolliver used that statement by the contracting officer as part of an argument regarding whether prices favorably compared, not whether they were consistent. As Tolliver has not shown that DigiFlight's proposed price was inconsistent with the prices proposed by the other two offerors, the Court cannot disturb the contracting officer's use of price comparison to find the prices fair and reasonable.

Moving to the prong of the "rule" that Tolliver actually addressed, Tolliver asserts that DigiFlight's proposed price did not favorably compare to the prices proposed by Tolliver and ▮▮▮ and, therefore, its price could not be found reasonable based on a comparison of prices. Tolliver cites GAO's decision in *Technatomy Corp.*, B-414672.5, 2018 WL 5292575 (Comp. Gen. Oct. 10, 2018), as support for the rule that the price compared must be favorable in order to be found fair and reasonable. *Technatomy*, however, is easily distinguishable. The agency in *Technatomy* did not perform any meaningful comparison of the prices. Instead, the price reasonableness analysis was two sentences long stating: "Price reasonableness is normally established by adequate competition (FAR 15.404-1(b)(2)(i)). As this effort has had 35 Offerors provide proposals, it is implicit that price reasonableness has been determined at the macro level." *Id.* at *9. GAO found that "[t]o conclude that prices are fair and reasonable without the comparison of prices to one another is illogical and inconsistent with the requirements of FAR § 15.404-1(b)(2)(i). As the plain language of this section indicates, a price reasonableness

determination relying upon this price analysis technique requires a '[c]omparison of proposed prices received in response to the solicitation.'" *Id.* (quoting FAR § 15.404-1(b)(2)(i)). This complete dearth of analysis, and the presumption of price reasonableness from the fact that there were multiple offerors, is what doomed the analysis in *Technatomy*. As addressed above, this is far from what the contracting officer did in this case.

What is more, the Court is not certain of the soundness of the "rule" that, to be fair and reasonable in comparison with other proposed prices, the price being assessed must favorably compare with the other proposed prices. To illustrate, assume that there are five offerors for a contract that will be awarded on a best-value basis. Offerors 1 through 4 are rated "acceptable" on all technical criteria and have proposed prices ranging from $10,000,000 to $10,500,000. Offeror 5 is awarded "good" on all technical criteria and with a proposed price of $10,750,000. According to this "rule," and Tolliver's argument based on the rule, the contracting officer in this procurement would not be able to use FAR 15.404-1(b)(2)(i) to find Offeror 5's price reasonable because it does not favorably compare to the other prices. The Court cannot agree with this conclusion. In this example, all proposed prices are within $750,000 of each other; the highest and lowest price vary by less than ten percent; and the highest price is less than one standard deviation from the mean. Yet, even given the close proximity of the prices, under this "rule" FAR § 15.404-1(b)(2)(i) could not be used as a price analysis technique to determine the reasonableness of the "unfavorable" $10,750,000 proposed price. Simply put, this "rule" is too blunt as the above example and several more that immediately come to mind illustrate. Although there are instances, like in *Serco*, in which competition does not ensure the existence of reasonableness, the above example and the current protest do not rise to that level of complexity so as to be shrouded from the general applicability of FAR 15.404-1(b)(2)(i).

In sum, contrary to Tolliver's position, the contracting officer did not "[do] exactly what *Serco*, Professors Nash and Cibinic[5] and *Technatomy* say the government can never do—assume prices are fair and reasonable just because there is competition." Pl.'s. MJAR at 11–12. Rather, the contracting officer conducted a robust comparison of the offerors' prices in which he broke down the prices and option periods compared to each other, found the composite labor rate, and compared the prices inclusive of the six-month extension option. AR 671–75. That alone would be enough to satisfy the FAR. But the contracting officer further found there was adequate price competition. AR 673. This "normally" is a stand-alone technique to find prices fair and reasonable. *See* 48 C.F.R. § 15.404-1(b)(2)(i) ("Normally, adequate price competition establishes a fair and reasonable price"). Tolliver has offered the Court nothing that satisfies

---

[5] Professors Nash and Cibinic conclude their analysis by saying "[o]ur conclusion is that when an agency selects an offeror with a significantly higher price an analysis of that price is required and the determination of fair and **reasonable price** should not state that the conclusion is based solely on the fact that adequate price competition occurred. That's a good way to lose a protest." *Determining That A Price Is Fair and Reasonable: Is Adequate Price Competition Enough?*, 33 Nash & Cibinic Rep. NL ¶ 36 (2019) (emphasis added). While this is a correct proposition, it is not what occurred in the procurement at issue here. The contracting officer did not end his analysis after finding that adequate price competition existed.

Tolliver's burden to show that the price comparison under FAR § 15.404-1(b)(2)(i) was irrational.

**b.   Plaintiff has failed to show the use of the IGCE was irrational**

Another method of price analysis permitted by FAR 15.404-1(b)(2)(v) to determine whether a price is reasonable is the "[c]omparison of proposed prices with independent Government cost estimates." The administrative record documents that the contracting officer conducted such a comparison. *See* AR 674 ("Additionally, the proposal analysis technique of comparison with the independent government cost estimate (IGCE), as described at FAR 14.04-1(b)(2)(v), was also utilized."); *see also id.* at 671–73.[6]   To get around this fact, Tolliver attacks the IGCE itself.

According to Tolliver, "[t]he record does not show that the IGCE was reasonable, so the contracting officer could not rationally rely on it for the fair and reasonable determination." Pl.'s MJAR at 17. To support its claim, Tolliver falsely analogizes the IGCE at issue here to the IGCE Judge Firestone encountered in *Nutech Laundry & Textile v. United States*, 56 Fed. Cl. 588 (2003), and urges the Court to follow the resolution of that case. Pl.'s MJAR at 20–21. The IGCE at issue in *Nutech* and the one present here are, unfortunately for Tolliver, not in the same ballpark. The IGCE at issue in *Nutech* was one-page long and, according to Judge Firestone, "completely lacking in any notes or back-up documentation. It [was] accompanied neither by a description of cost figures upon which it [was] based nor the basis for arriving at the costs listed." *Nutech Laundry & Textile*, 56 Fed. Cl. at 594. In contrast, the present IGCE contains sufficient information for the Court to ascertain that the contracting officer's reliance on it was rational. The IGCE states that the rates it is based on are labor rates from the GSA CALC tool using the previous contractor's labor categories. AR 52.1; AR 674. Critically, labor rates make up the vast majority of the cost of this procurement. *See* AR 43; *see also* Pl.'s MJAR at 11 ("[T]he labor rates are the major cost drivers in this acquisition[.]"). Additionally, the IGCE itself is nine-pages long, detailing—for the base period and the five subsequent option periods—eighteen different positions, their rates, and number of work hours estimated for the project. AR 43–52. The IGCE further explains that "[the] [e]stimate was prepared using the GSA CALC tool and utilizing the AMCOM EXPRESS historical labor categories. Future increase estimates were derived by applying an escalation of 3% to prior year labor rates." AR 52.1. This is a far cry from the IGCE Judge Firestone confronted in *Nutech*.

---

[6] Tolliver did argue that the administrative record "never shows the contracting officer relying on [the comparison with the IGCE] to make a fair and reasonable determination." Pl.'s MJAR at 16. Going further, Tolliver argues that—even if the contracting officer relied on the IGCE–he failed to adequately document such reliance. Pl.'s MJAR at 16–17. The Court finds both these arguments unpersuasive and contrary to the documentation in the administrative record. Indeed, among other documentations of the comparison, AR 671–72 literally shows a chart comparing the proposed prices to the IGCE. *See, e.g.*, AR 671 ("The following is a summary comparison of the Independent Government Cost Estimate (IGCE) and the Offerors' proposed prices . . . ."); AR 673 ("All Offerors quoted prices (to include the additional six-month extension) were less than the IGCE. ███████ total price of $██████████ is ██% lower than the IGCE value of $64,588,809.63. DigiFlight's total price of $60,275,408.39 is 7% lower than the IGCE. [Tolliver]'s total price of $43,794,113.03 is 32% lower than the IGCE. Below is a comparison chart of Total Labor Dollars and IGCE with the Composite Labor Rate.").

In its response and reply brief, Tolliver argues that any reliance on the IGCE is irrational because "[t]he contracting officer had no basis to conclude . . . that DigiFlight's price was reasonable just because it was lower than the IGCE's not-to-exceed number. . . . The only reasonable conclusion the contracting officer could have drawn is that DigiFlight's cost is slightly less than the highest price the Army could ever possibly pay a GSA contractor for this work."[7] ECF No. 37 at 13.[8] The parties spend significant briefing debating exactly where the inputs for the IGCE came from, what the IGCE number stands for, and how exactly the contracting officer could reasonably use this information. *See* Pl.'s. MJAR at 17–23; ECF No. 35 at 24–26; ECF No. 36 at 12–16; ECF No. 37 at 9–14; ECF No. 40 at 11–14. Tolliver's argument is that "it was unreasonable for the contracting officer to use the IGCE to determine price reasonableness because it was a not-to-exceed number, not an estimate of the reasonable cost of services." ECF No. 37 at 12.

However, as the government explained, "because the IGCE does *not* reflect maximum rates, referring to it as an [not-to-exceed number] evinces that the Government was not going to pay any price over the IGCE." ECF No. 35 at 25 (emphasis in original). Put another way by the government at oral argument, "the IGCE was created to ascertain a price that the Government was willing to pay . . . for this task order. . . . The categories themselves were pulled from GSA using the CALC tool. The rate for individual contractors for all of these labor categories are different. They're negotiated between those contractors and GSA. Those rates could be higher; they could be lower. And as we know in this case, just as between these three bidders or quoters,

---

[7] Plaintiff also argues, both in the MJAR and its reply, that because the contracting officer stated in his determination that "[b]ased upon adequate price competition, DigiFlight's price in considered fair and reasonable[,]" AR 685, that "[t]he Court need not wade into the IGCE unless the record shows the contracting officer's determination relied on it." ECF No. 37 at 9. First, the Court believes that the administrative record clearly shows the contracting officer relied on this information in making his determination and the Court does not believe it should only cabin its review of the administrative record to the page titled determination because the Court reviews the administrative record as whole. 5 U.S.C § 706. Second, the Court can uphold the determination on clearly relied upon alternative grounds even if they are not specifically invoked by the contracting officer. *See Oracle Am., Inc.*, 975 F.3d at 1291 ("[A] court may affirm the decision of an agency on a ground other than the ground given by the agency, so long as it is clear that the agency would have reached the same decision if it had been aware that the ground it invoked was legally unavailable, or if the decision does not depend on making a finding of fact not previously made by the agency.").

[8] Plaintiff attempts to bolster this argument by arguing that some of DigiFlight's prices for certain labor categories exceed the "maximum" number and that the contracting officer overlooked this problem in his use of the IGCE. ECF No. 37 at 11–12. Plaintiff indicates that means the contracting officer was either incorrect about what he thought the IGCE was "or DigiFlight's pricing was so high that it exceeded several of the IGCE's rates, even with significant discounts." *Id.* at 12. Interestingly enough, even some of Tolliver's pricing was "so high" that it exceeded the IGCE's rates. *Compare* AR 703 with AR 45 (showing Tolliver's undiscounted rate at $███ and the IGCE rate at $███); *Compare* AR 699 with AR 45 (showing Tolliver's undiscounted rate at $███ and the IGCE rate at $███). But "[t]here has been no prejudice when a bid protestor benefited from the same potentially unlawful discretion from which the awardee benefited." *G4S Secure Integration LLC v. United States*, No. 21-1817C, 2022 WL 211023, at *8 (Fed. Cl. Jan. 24, 2022). Moreover, the government rebutted Plaintiff's argument succinctly when it stated, "if an offeror proposed a price for a particular service that exceeds the IGCE estimate for that service, and the offeror's total proposed price did not exceed the IGCE total overall composite price amount, the offeror's total proposed price was determined to be fair and reasonable." ECF No. 39 at 14.

the rates were different." Tr. 43:12–24.  In other words, contrary to Tolliver's assertion, the labor rates in the IGCE are *not* the maximum that an offeror could bid or the most the agency could ever pay for the task order.  Rather, the IGCE appears to be exactly what it is supposed to be, an estimate of the price "that a prudent businessperson would pay for an item or service under competitive market conditions, given a reasonable knowledge of the marketplace."  AR 79.  Thus, when the contracting officer is referring to the IGCE price as the maximum, he is referring to it as the maximum *reasonable* price that the government would pay, not, as Tolliver argues, the "highest price the Army could ever possibly pay a GSA contractor for this work."  ECF No. 37 at 13.[9]  The administrative record bears this out.  For instance, the maximum DigiFlight could ever charge for this work in accordance with its undiscounted GSA-approved rates is $81,652,485.15.  AR 579.  That is $17,163,676.72 more than the IGCE that Tolliver claims represents the maximum that the agency could ever pay for this work.

Finally, contrary to Tolliver's assertion, accepting the labor rates from the GSA CALC tool and using the historic labor categories does not violate the Deviation.  The Deviation, in relevant part, states

> "[s]ervices offered on the schedule are prices either at hourly rates, or at a fixed price for performance of a specific task. . . . GSA has determined the prices of supplies and fixed-price services, and rates for services offered at hourly rates, to be fair and reasonable for the purpose of establishing the schedule contract.  GSA's determination does not relieve the ordering activity contracting officer from the responsibility of making a determination of fair and reasonable pricing . . . using the proposal analysis techniques at 15.404-1.

*See* Deviation.  The contracting officer made a comparison that these prices are *lower* than the GSA prices, but he is not *relying* on the determination from GSA that these prices are reasonable in order to make the determination that offerors' submitted prices are reasonable.  Contracting officers are allowed to use their knowledge and expertise during the procurement process, including in the price reasonableness analysis.  *DynCorp Int'l LLC*, 139 Fed. Cl. at 487.  The contracting officer did just that here.

While this may not be the most ideal IGCE, there is ample information to allow the contracting officer to rationally rely on the IGCE for price comparison.  *See Veteran Shredding, LLC v. United States*, 146 Fed. Cl. 543, 580–81 (discussing the rationality of a government cost estimate).  The Court finds that Tolliver has not shown that the contracting officer acted irrationally in his reliance on the IGCE.  If the IGCE was the sole basis upon which the contracting officer determined the prices were fair and reasonable, this protest might have presented a more difficult question.  But it is not.  Instead, the IGCE provides some support for

---

[9] A review of the price range from the price realism analysis drives this point home.  For example, DigiFlight's Functional Analyst I undiscounted onsite and offsite prices are $████ and $████ respectively.  The mean price found on the GSA CALC tool was $110, but there were at least a handful of agreed-upon rates from $156 to $274.74.  AR 736.  As the government pointed out at oral argument, these are negotiated rates that GSA has deemed reasonable, and thus could be found reasonable in a DOD procurement such as this, leading to a much higher overall cost that the government could pay.  Tr. 43:18–25.

the conclusion that the prices are fair and reasonable, and Tolliver has not demonstrated that the contracting officer's reliance on this comparison, in conjunction with other price analysis techniques, was irrational.

### c. The contracting officer did not err by relying on the GSA CALC tools rates for comparison with the offerors' rates

Finally, Tolliver takes issue with the contracting officer's statement that "[g]overning rates were determined to be fair and reasonable in both GSA schedules and EXPRESS BPA vehicles and proposed rates for this [Task Order] were discounted even further." AR 674. Tolliver argues the contracting officer's logic—that "because the Schedule rates were fair and reasonable, anything less than that was necessarily fair and reasonable"—violates DFARS § 8.404(d). *See* Pl.'s MJAR at 14–15. The Deviation, according to Tolliver, means, "[i]t was unreasonable for the contracting officer to rely on the comparison against competitors' prices to find DigiFlight's 'rather significantly higher' pricing fair and reasonable." Pl.'s MJAR at 15. The solicitation is clear that the Deviation applies to this procurement, AR 9, but Tolliver's conclusion regarding the scope of its applicability is incorrect.

The contracting officer knew that the GSA rates were found to be reasonable by GSA. However, the Deviation forbids the contracting officer from solely relying on that finding by GSA to determine that the proposed prices are reasonable. Instead, in a DoD procurement, a contracting officer must "mak[e] a determination of fair and reasonable pricing . . . using the proposal analysis techniques at 15.404-1." *See* Deviation. Here, the contracting officer used two specific price analysis techniques from the FAR to determine that the proposed prices were fair and reasonable, but he did not stop there. AR 671–73. He also took the offerors' discounted rates from their GSA Multiple Award Schedule rates and ran each individual labor category through the GSA CALC tool to compare these prices—both discounted and undiscounted—to the GSA marketplace in order to determine if they were realistic. AR 686–744. As has been discussed, the contracting officer "viewed the collection of rates [in the CALC tool] as a robust and relevant repository with usefulness in the realism assessment." AR 674. He found that "the rates were competitively, perhaps even aggressively, priced (particularly ███ and [Tolliver])." *Id.* Although this task was undertaken for the purposes of the realism analysis, the contracting officer did not lose all the insight he gained from examining price realism when he examined price reasonableness. Therefore, as has been mentioned, the Court will not cabin its review solely to the subsection labeled "price reasonableness."

Rather, the Court examines the reasonableness analysis based on the entirety of the "Best Value and Fair and Reasonable Determination." AR 637–85. While Tolliver may wish the Court to limit its review to the subsection specifically titled "price reasonableness," the Court declines to do so when other parts of the document clearly support the conclusions reached in the price reasonableness subsection. Upon review of the whole document, it is clear that the agency acted rationally when it concluded that all of the prices proposed were reasonable. Other parts of the "Best Value and Fair and Reasonable Determination" clearly demonstrate the contracting officer's extensive analysis of the proposed prices for this solicitation. The Court is not going to ignore that clear documentation simply because it lacks the caption "price reasonableness." Nor will the Court require the agency to repeat in every applicable place every applicable finding.

Reviewed holistically, the Best Value and Fair and Reasonable Determination shows that Tolliver failed to carry its burden to show that the contracting officer acted irrationally in determining that DigiFlight's price was reasonable.

Moreover, as the government highlighted in its MJAR,

DFARS 208.404 does not require that the contracting officer ignore the GSA's prior fair and reasonableness determination. . . . .   The contracting officer had the discretion to also consider that all offerors' price quotes were ***below*** the GSA schedule rates that had been determined fair and reasonable, and it was prudent to do so.

ECF No. 35 at 25–26 (emphasis in original).  In sum, the contracting officer did not err by relying on the GSA CALC tools rates for comparison with the offerors' rates.

## 2.   Tolliver Failed to Show that the Agency's Best-Value Determination was Irrational

In Tolliver's final at-bat, it argues that the best-value determination conducted by the contracting officer was irrational.  In assessing Tolliver's best-value determination argument, the Court is mindful that "[p]rocurement officials have substantial discretion to determine which proposal represents the best value for the government."  *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996).  Indeed, "[i]t is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when . . . the contract is to be awarded to the bidder . . . that will provide the agency with the best value."  *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1355 (Fed. Cir. 2004) (citing cases).  As such, the Court will not disturb an agency award if the agency reasonably and properly exercises its discretion. *See, e.g.*, *Blackwater Lodge & Training Ctr., Inc. v. United States*, 86 Fed. Cl. 488, 514 (2009) ("Where agency officials reasonably and properly exercise their discretion when conducting a best value analysis, the Court will not disturb an agency award.").  For the reasons outlined below, the Court finds that Tolliver has not carried its burden to surmount the discretion afforded to the agency in determining which offeror presented the best value for the government.

The solicitation made clear that non-price factors (Technical Expertise and Risk Mitigation and Management) were "of equal importance, and each of them is of greater importance than Price."  AR 75.  Because the award was to "be made to the Offeror whose quotation provides the best value to the Government based upon the evaluation [] and a tradeoff process[,] . . . the Government [was permitted to] accept other than the lowest price quotation where the decision is consistent with the evaluation criteria and the Government reasonably determines that the perceived benefits of a higher priced quotation warrants the additional price." *Id.*  The agency rated the proposals as follows:

| OFFERORS | ▓▓▓▓ | DigiFlight | Tolliver |
|---|---|---|---|
| Technical Expertise | Acceptable | Good | Acceptable |
| Risk Mitigation & Management | Acceptable | Good | Acceptable |
| Price | ▓▓▓▓ | $60,275,408.39 | $43,794,113.06 |

AR 745, 756, 768.

Tolliver's first challenge is that the tradeoff decision "lacks a rational basis because it relied on [the contracting officer's] flawed price reasonableness findings." Pl.'s MJAR at 24. As discussed above, the Court determined that Tolliver failed to carry its burden to demonstrate that the contracting officer's price reasonableness determination was irrational. Accordingly, Tolliver's first challenge to the tradeoff determination fails.

Tolliver next challenges each of the three reasons the contracting officer used to support his determination to pay the price premium. Pl.'s MJAR at 25–29. The first reason the contracting officer offered in support of his best value determination was that there is a cost savings by selecting DigiFlight over the IGCE. AR 682. Tolliver argues that it was irrational for the contracting officer to find that "the Government will still realize cost savings of over $4 million by awarding to DigiFlight." Pl.'s MJAR at 25. Tolliver argues "that cost savings is not real" because "[t]he Army does not have a $64 million offer in hand." Id. The Court agrees that it was improper for the contracting officer to attempt to justify his tradeoff decision by recognizing a price savings that does not actually exist. The IGCE was not an offer made in response to this procurement; therefore, no cost savings could exist from choosing DigiFlight over a government cost estimate. This irrational determination, however, is not fatal to the tradeoff decision as the decision was supported on two other grounds.

The second reason the contracting officer offered for choosing DigiFlight's higher priced offer was essentially that he was more confident that DigiFlight's proposed price was firmer than Tolliver's such that "the Government has concern that the $15 million difference between [Tolliver] and DigiFlight will shrink over the five years of this task order if all options are exercised." AR 683. Focusing solely on the contracting officer's statement that Tolliver's assigned weakness "in the budgeting and cost estimating areas raises the risk that the Government will pay more and expend more resources" if Tolliver was the awardee, AR 682–83, Tolliver argues that the contracting officer's second reason is irrational because the evaluation team said the weakness Tolliver received "would 'have little to no impact on contract performance.'" Pls' MJAR at 27 (citing AR 651, 656). According to Tolliver, the contracting officer acted irrationally by determining that this weakness justified DigiFlight's price premium. Id.

Tolliver's argument swings and misses. The sole difference between DigiFlight and Tolliver is not that singular weakness. First, DigiFlight received superior ratings on both of the two non-price factors, receiving a strength on each. AR 645–50; AR 662–64; AR 684. Second, that singular weakness is not what the contracting officer rested the entire price differential on. Immediately after the clause upon which Tolliver focuses its argument, the contracting officer states: "[f]urther, the lower risks of resource expenditure and the ability for DigiFlight to

30

leverage its reach back capability in providing personnel provides the Government with confidence that DigiFlight's quoted price is much firmer than [Tolliver's] quoted price." AR 683. Sentences later he also wrote that "DigiFlight, Inc.'s quotation provides the Government with unmatched technical expertise and risk mitigation and management in support of the [contract]. While similar services can be obtained, the level of technical expertise that DigiFlight can provide in addition to its experience in providing support to above this level is critical to mission success." *Id.* According to the adjectival ratings definition for this procurement, the ratings Tolliver and ▮ received mean that their offers preset a moderate risk of nonperformance of the contract, whereas DigiFlight's ratings indicate that DigiFlight's offer presents a low risk of nonperformance. These findings in total are what justifies the price difference—not simply, as Tolliver alleges, Tolliver's weakness in the budgeting and cost estimating areas. The non-price factors are more importance than price, and price only matters when the non-price factors are close. But here they are not. DigiFlight's proposal was more highly rated than the proposals of the other two offerors. That is what the contracting officer found justified the price premium. It is the totality of the circumstances, not just one weakness from Tolliver, that led the contracting officer to determine that DigiFlight offers the best value. The contracting officer's tradeoff discussion between DigiFlight and ▮ confirms that this singular weakness was not the sole justification for choosing DigiFlight over Tolliver. In trading off DigiFlight versus ▮, the contracting officer specifically notes that ▮ "does not contain the same weakness as [Tolliver]" but still makes the same tradeoff decision between DigiFlight and ▮ as he did between DigiFlight and Tolliver (there is less than $1 million separating the proposed prices from ▮ and Tolliver). AR 683.

The contracting officer reasonably and properly exercised his discretion, and the Court will not disturb this finding. *Blackwater Lodge,* 86 Fed. Cl. at 514. The contracting officer directly traded off DigiFlight's rating of "good" in both non-price factors with ▮ and Tolliver's ratings of "acceptable" on both non-price factors. As the solicitation points out, "[t]he first two criteria, Technical Expertise, and Risk Mitigation and Management, are of equal importance, and each of them is of greater importance than Price. Price is not expected to be the controlling criterion in the selection, but its importance will increase as the differences between the evaluation results for the other criteria decrease." AR 75. It is uncontested that DigiFlight exceeds both ▮ and Tolliver on the first two criteria. Tolliver's and ▮ adequate ratings both equate to a moderate risk of nonperformance; whereas DigiFlight's good ratings equate to a low risk of nonperformance.

It was rational for the contracting officer to find DigiFlight worth the price premium:

> The Government believes . . . the benefits of the higher priced quotation warrant the additional price. DigiFlight's adjectival ratings, noted strengths, and overall understanding of the requirements for both Technical Expertise and Risk Mitigation and Management were higher than ▮ and [Tolliver]'s. DigiFlight, Inc., received the highest rating in the two most important evaluation criteria. The Government looked at each Offeror's quotation with respect to the Price Factor, as mentioned herein, is the least important and is NOT the controlling criterion in this selection. When considering the Price Factor in conjunction with the other, more important Factors combined, DigiFlight Inc., has an advantage over ▮ and

> [Tolliver]. The Government believes the "Good" Technical Expertise and "Good" Risk Mitigation and Management ratings (versus "Acceptable") justify the price premium. Therefore, when comparing the Offeror's quotation, price remains the least important criteria. Therefore, the cumulative benefits provided by DigiFlight, Inc., support the Government's payment of a higher price premium.

AR 684. Put another way "it was within the agency's discretion to determine how much of a price premium it was willing to pay in light of the perceived benefits of each proposal." *Technology Innovation All. LLC v. United States*, 149 Fed. Cl. 105, 160 (2020). While Tolliver may disagree with this determination, it does not provide a basis for the Court to second-guess the best-value determination. *See Sparksoft Corp. v. United States*, 167 Fed. Cl. 694, 713 (2023) ("The administrative record demonstrates that the Contracting Officer followed the terms of the RFQ and reached a reasonable best value determination based on the underlying evaluations of the various factors and the relative merits of the quotes. [] Sparksoft's disagreement with the Contracting Officer's exercise of her discretion and judgment does not provide a basis for the Court to second-guess CMS's best value tradeoff decision."). As such, this challenge to the contracting officer's rationale fails. Tolliver has failed to show that the contracting officer acted irrationally in either his price reasonableness determination or his best value and tradeoff determination.

## CONCLUSION

For the reasons set forth above, the Court **DENIES** Tolliver's motion for judgement on the administrative record, its motion for injunctive relief, and **GRANTS** the cross-motions for judgment on the administrative record filed by the government and DigiFlight. The clerk shall enter **JUDGMENT** accordingly.

**IT IS SO ORDERED**.

<u>s/ Zachary N. Somers</u>
ZACHARY N. SOMERS
Judge